No. 3721

Second Circuit

WILLIAMS ET AL. v. INTERNATIONAL PAPER CO.

(December 31, 1929.   Opinion and Decree.)

Todd & Todd, of Bastrop, attorneys for plaintiffs, appellants.

Madison & Madison, of Bastrop, attorneys for defendant, appellee.

ODOM, J.   Pete Young was employed by the defendant company as a laborer at its pulp and paper mill in Bastrop, and on the morning of February 19, 1929, was found dead at his post of duty. These plaintiffs, claiming that they were dependent upon deceased for support, bring this suit for compensation under Act No. 20 of 1914 and its amendments, alleging that

the deceased was accidentally killed in the course of his employment.

The defense is that deceased was not accidentally killed, but that his death was due solely to natural causes. In the alternative, defendant pleads that plaintiffs were not in fact dependent upon deceased for support.

Plaintiffs' demands were rejected by the lower court, and they have appealed.

## OPINION .

Pete Young was a colored man, and employed by defendant to work in its pulp and paper mill. In that portion of the place where he worked, there is what is called the "disc," which was described by Mr. Ross as a "rectangular tunnel with power driven discs inside." From the testimony as a whole, we understand that what is referred to as the *disc* is a tank with inside dimensions approximately 10x5 feet, which, during the operation of the mill, is filled with a liquor containing chemicals used in the process of converting wood into pulp. This tank, or "disc," as it is called, as well as the liquor which it contains, is heated to a very high degree during the operation of the mill. Due to evaporation, there accumulates in the bottom of the tank a sediment which it is necessary to remove at intervals, in order to keep it from clogging the discs. The sediment, or accumulation, can be removed and the disc cleaned only when the mill, or that part of it, is closed down and the disc allowed to cool. It is dark on the inside of the disc, and, in order to see how to do their work, the laborers have to carry with them an electric light attached to an extension cord.

On the morning of February 19th, at about 7:30 o'clock. Pete Young and another colored man, named Brown, were ordered to clean the disc. Brown went in first, and, according to his testimony, stayed five minutes, although there is testimony that he stayed longer, and came out. When Brown came out, Pete Young went in and presumably began to work. Brown stayed out for about five minutes and went back, looked into the tank, and found Young sitting on the bottom of it, dead. Young's body was immediately removed to a sanitarium where physicians and others resorted to artificial means of respiration to restore him, but without avail.

It is plaintiffs' contention that Young was killed by accident, and in support of their contention they advance several theories. One is that death resulted from an electric shock received from the electric light wire or bulb which Young carried into the tank with him. When Young's body was found in the tank, the electric light was still burning, and the cord was lying across his right arm or hand, and there was a burn or blister on one, or possibly two, of his fingers. Physicians say, however, that this was not an electric burn, and, as corroborating their theory that it was not such, it was shown that the wire was well insulated. and nowhere exposed, that there had been no short circuit, as evidenced by the fact that the light was burning when the body was found and continued to burn for several hours thereafter; and, further, that, shortly after the body was found, several persons, including a physician, handled the light bulb and pulled the wire through their hands and felt no shock and received no burn. There is no suggestion that the wiring was defective, and, in the absence of any testimony or suggestion that it was, and in view of the fact that others tested the wire and the bulb by handling them without ill effects, there is no room for the

assumption that death was due to an electric shock. There is some testimony, however, that laborers had on other occasions been shocked while working in or about the "disc," but there is no testimony showing, or tending to show, that, when such shocks were received, the wiring was in perfect condition as it was shown to be in the present case.

Another theory advanced by plaintiffs is that Young died as a result of becoming overheated. There is some testimony to the effect that the disc was very hot at the time Young went in that morning. The colored man, Brown, who first went in, said it was so hot that he could not remain inside more than five minutes. But his testimony to that effect is discounted, if not overthrown, by that of Ross, Hammons, the foreman, Mr. McDonald, the safety superintendent for the mill, and of others. Mr. Hammons and Mr. McDonald testified that they went into the disc immediately following the death of Young, and Mr. Hammons stated that the place was perfectly cool, and Mr. McDonald stated that, while it was warmer inside the disc than out, yet it was not hot. The testimony shows that the disc became entirely cool and comfortable within eight hours after the mill was shut down. The colored man Brown himself testified that the disc would cool within eight hours. It is shown that the mill was shut down at 10 o'clock on the night before, so that, according to the testimony, the place was not uncomfortably hot at the time Young entered it. Mr. Ross and others testified that the disc would cool sufficiently within two hours after the furnace was shut off for laborers to work within it, and that, after a shutdown of eight or ten hours, it was perfectly comfortable. Physicians testified that in their opinion death was not caused by

overheating, and assigned scientific reasons for their conclusions.

The third and last theory advanced is that there was or may have been within the tank poisonous gases given off by the chemicals in the liquor.

Mr. Nessines and Mr. Ross, both chemists, testified that, while the mill was in operation and the liquor heated to a high temperature, small amounts of both carbon dioxide and carbon monoxide gases were given off, due to evaporation, but that these gases did not remain after the heat was cut off and the tank was opened; that these gases were taken out by the current of air which passed through the disc. They testified, as did a physician, that carbon dioxide gas in as small percentage as that given off during these operations is harmless, but that carbon monoxide is very poisonous. Conceiving that there was a possibility that deceased may have been poisoned by these gases, the three physicians who made a post mortem examination removed the lungs and sent them to a laboratory to be examined. They were examined, and the report as to gas poisoning was negative.

When the body was found, there were no external signs to indicate the cause of death. The body was carried to a clinic operated by Dr. Garnier, who handles and treats patients for the defendant. He and Dr. Jones examined it and could not determine the cause of death, and summoned Dr. Leavel, the coroner. Dr. Leavel says that he considered it his duty as an officer to ascertain the cause of death, and the testimony shows that the three physicians, Dr. Garnier, Dr. Jones, and Dr. Leavel, proceeded with unusual zeal in their efforts towards that end. They removed the heart, the lungs, the stomach, and parts of the brain, and sent the lungs

to the laboratory for examination, as already stated. They found nothing wrong with the lungs or the brain, but found the stomach literally "stuffed," as they say, with uncooked and undigested food, which condition may have caused a serious disturbance of the heart, but they did not think that death was due to what is sometimes referred to as "acute indigestion."

The opinion of these physicians was that death was due to heart failure. They found that deceased had a badly diseased heart, a condition called "aortitis," brought on by syphilis. An examination showed that there were growths resembling warts on the valves of the heart, and scars indicating that some had been broken off and had possibly gone into the blood stream. They all agreed that these growths interfered materially with the heart action, and gave it as their opinion that one so afflicted is likely to drop dead at any moment, under most favorable conditions. They said, however, as did Dr. Rodgers, that even with such a heart one might live for twenty or twenty-five years. Dr. Rodgers, who examined the heart, says he noticed "ulcers down in the chambers of the heart and some thickening of the valves," which he later said was the aortic valve. He said, as did the other physicians, that one in such condition was liable to pass out at any moment.

The testimony, having established that deceased was afflicted with a diseased heart which might cause death at any moment, but that he might have lived for a number of years under ordinary conditions, counsel for plaintiffs, in oral argument and in a most able and exhaustive brief filed, stress the proposition that, if the labor performed or the conditions under which the work was done aggravated the condition or hastened the inevitable collapse, there was accidental injury and death, under the Compensation Acts. Their argument on this point is supported by the settled jurisprudence of this and other states. In the case of Becton vs. Deas Paving Co., 3 La. App. 683, decided by this court in 1926, we discussed the question quite at length, and cited many cases from our own Supreme Court and courts of last resort of other states.

But in the Becton case, and in those cited, it was held that there could be no recovery unless there was shown to be a causal connection between the labor performed and the collapse, and that the injury or death was hastened or resulted from the employment as a proximate inducing cause. In the Becton case and others cited by counsel, there was found to be a direct connection between the labor performed and the injury or death.

The case at bar falls for lack of such proof. The two physicians who made the autopsy and who investigated the conditions under which deceased worked, gave it as their professional opinion that death resulted from natural causes, and that the labor performed by Young and the conditions under which he worked had nothing whatsoever to do with his death. In cases of this kind, courts must necessarily rely upon the opinions of those learned in the medical profession. The most that could be said is that plaintiffs have made out a suspicious case, but the evidence fails to produce conviction. In compensation cases, where it is alleged that injury or death was due to accidental causes, plaintiffs must do more than show that the death was probably due to an accident or as the result of employment. They must prove that fact with at least some degree of legal certainty. Wilson vs. Harris, 3 La. App. 195; Stevens vs. Ohio Oil Co., 3 La. App. 81; Dennis vs. Fortuna Oil Co., 5 La. App. 709.

The judgment appealed from is correct, and is therefore affirmed.